## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| AGRIPROCESSORS, INC., | ) | BANKRUPTCY |
| | ) | NO.   08-2751 |
| Debtor. | ) | |
| | ) | |
| JOSEPH E. SARACHEK, | ) | |
| in his capacity as Chapter 7 Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ADVERSARY |
| | ) | NO. 10-09196 |
| RON WAHLS; GARNAVILLO | ) | |
| GOSPEL HALL ASSOCATION | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This Court held trial in this adversary on August 29, 2012.  Desiree A. Kilburg appeared for Plaintiff, Joseph E. Sarachek, in his capacity as Chapter 7 Trustee.  Laura Seaton and Lynn Hartman appeared on behalf of Defendant Garnavillo Gospel Hall Association ("Garnavillo Gospel").  Ron Wahls appeared pro se.  The Court took the matter under advisement and provided time, at Trustee's request, for additional briefing.  The briefs were filed and the case is ready for disposition.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

## STATEMENT OF THE CASE

Trustee initially sought to recover preferential or fraudulent transfers from

Debtor to Defendants totaling $164,375.22.  At trial, Trustee proceeded only on the

fraudulent conveyance theory, and the parties stipulated that the checks at issue

totaled $141,700.25.  Garnavillo Gospel argued that, at most, it and its President

Ron Wahls were a conduit for the transfers, which cannot be recovered from them

as fraudulent transfers.  Garnavillo Gospel alternatively argues that if it cannot be a

conduit, Ron Wahls acted outside his authority—and not as Church President—on

this matter, and Trustee can recover only against Wahls.  Trustee claims he proved

his case, and argued the Defendants could not be considered mere conduits.  The

Court disagrees with Trustee and decides the case for Defendants.

## BACKGROUND

Debtor owned and operated one of the nation's largest kosher meatpacking

and food-processing facilities in Postville, Iowa.  On November 4, 2008, Debtor

filed a Chapter 11 petition in the Bankruptcy Court for the Eastern District of New

York.  Debtor's bankruptcy petition and accompanying documents recited that its

financial difficulties resulted from a raid conducted by U.S. Immigration and

Customs Enforcement.  A total of 389 workers at the Postville facility were

arrested.  The raid led to numerous federal criminal charges, including a high-

2

profile case against Debtor's President, Sholom Rubashkin.  Debtor's Petition also stated it had over 200 creditors and assets and liabilities in excess of $50,000,000.

The court eventually approved the appointment of Joseph E. Sarachek as the Chapter 11 trustee.  The court concluded that appointing a trustee was necessary in part "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management" under § 1104(a)(1).  After hearings in a later proceeding, the court transferred the case to this Court on December 15, 2008.  This Court eventually converted the case to a Chapter 7 bankruptcy.  The U.S. Trustee for this region retained Mr. Sarachek as the Chapter 7 trustee.

On November 2, 2010, Trustee filed a Complaint to avoid fraudulent conveyances and preferential transfers.  Trustee alleged that within two years of the petition date, Defendants received seventy-seven checks totaling $164,375.22 from Agriprocessors, Inc. or Cottonballs, LLC.  Trustee asked the Court to declare the payments recoverable as fraudulent conveyances under § 548 or preferences under § 547(b).  Garnavillo Gospel filed its answer and affirmative defenses on February 8, 2011.  Wahls did not make any filings.

On December 12, 2011, Garnavillo Gospel filed a Motion for Summary Judgment.  The Court held a hearing on the Motion on January 20, 2012.  In response to the Motion, Trustee argued the Court should defer ruling until Trustee

3

took the deposition of Ron Wahls and/or finished other discovery.  The Court

granted Trustee's request and gave Plaintiff until February 3, 2012, to complete

discovery and until February 10, 2012, to supplement the resistance to the Motion

for Summary Judgment.  The Court extended these deadlines after Wahls failed to

appear for the first scheduled deposition.  Wahls's deposition was eventually taken.

After the deposition, Garnavillo Gospel renewed its Motion for Summary

Judgment.  Trustee resisted.  The Court held another hearing on the merits of the

Motion and took the matters under advisement.  The Court issued a ruling denying

Garnavillo Gospel's Motion for Summary Judgment and Renewed Motion for

Summary Judgment.  Sarachek v. Wahls (In re Agriprocessors, Inc.), Bankr. No.

08-2751, Adv. No. 10-09196, 2012 WL 1945701 (Bankr. N.D. Iowa May 30,

2012).

The case proceeded to trial on August 29, 2012.  Trustee and Garnavillo

Gospel submitted post-trial briefs.

## FINDINGS OF FACT

Ron Wahls is President of Garnavillo Gospel—a church/faith community in

Garnavillo, Iowa.  Ron Wahls is also a school counselor at Postville Community

School District.  In his school counselor job, he dealt extensively with immigrant

families and students.   Many of the parents or household heads worked at the

Agriprocessors plant in Postville.

4

Wahls got to know Sholom Rubashkin, the President of Agriprocessors, through the school's interface with the plant. This interface was mainly to get a hold of parents working at the plant when they were needed for school-related matters—mainly sick kids, student absence issues, and the like. Rubashkin assisted Wahls with setting up better communication between the school and the plant for these situations.

Wahls and Rubashkin developed a friendship and continued to work together on things related to the school and families in the community. Rubashkin donated money for key school needs. Wahls appreciated his help.

The matters relevant to this case arose when Rubashkin asked Wahls if he knew of some families in Postville that needed some work. Rubashkin was in need of workers to build chicken barns for one of Agriprocessors' related entities— Cottonballs, Inc. Wahls stated that Rubashkin contacted him because Wahls helped many of the immigrant families and would know who needed and/or might be available for work.

Wahls arranged a group of workers for Rubashkin. When they finished, Rubashkin sent payment to Wahls and asked him to distribute the money to the workers. Wahls did not think anything of it, and did so. This process—Rubashkin asking Wahls to help get workers for the chicken barns, Wahls arranging the

workers, and Rubashkin making payment to or through Wahls—continued on through the duration of the chicken barn project.

Rubashkin sent the checks to Wahls.  They were originally made out to Wahls only.  As time went on, some were made out to Wahls and some to Garnavillo Gospel.  Most of the checks came from Cottonballs, but some were from Agriprocessors.  No matter how the checks were made out, or which entity they were from, Wahls cashed them at his personal bank (not the Church's bank) and distributed the sums owing to each worker.

Wahls testified that there was usually some list with the checks that indicated hours worked and/or how the funds should be divided and paid.  Wahls admits that he might, with 20/20 hindsight, have asked more questions about this payment arrangement.  However, he noted his real concern at the time was to help members of the immigrant community (many with language barriers) get work and get paid.  He knew if he handled the role of receiving and distributing the money, the workers would get paid.

Wahls never involved anyone from Garnavillo Gospel with this business or arrangement.  No one from Garnavillo Gospel knew about it while it was occurring.  He had no authority from Garnavillo Gospel to act in this role.

Wahls admits that many checks were made out to him as President of Garnavillo Gospel, or just to Garnavillo Gospel.  He did from time to time wonder

6

why the checks were made out in that fashion.  However, he never seriously

questioned it.  He stated again and again that his biggest concern was getting the

workers paid.  Knowing that the checks he received were always for that purpose

and came with instructions on who to pay and how much, he continued forward.

He admits that he was able to cash the checks to Garnavillo Gospel because he was

known as the President and was trusted at his small-town bank.  Although he

generally does not handle financial matters, he did have the power to write and

deposit checks for Garnavillo Gospel.

Neither Wahls nor Garnavillo Gospel got anything—not a single penny—for

Wahls' actions.  Wahls never deposited the checks into his or Garnavillo Gospel's

bank accounts, and neither he nor Garnavillo Gospel kept any of the money.

Agriprocessors never paid Wahls for his services.  Wahls did the whole thing

himself out of a sense of obligation to the workers, and to his very deeply held

Christian faith.  All the money went to the workers for the work they did for

Cottonballs and/or Agriprocessors.

The Court specifically finds Wahls to be an exceptionally credible witness.

The Court essentially accepts his testimony in its entirety.  The Court also finds

John Kregel, the treasurer of Garnavillo Gospel, to be a very credible witness.

John Kregel testified that Wahls acted entirely on his own, without involving the

Church at all, and without any authority from the Church to do those things.  He

noted that he and the other Church members found out about this only after the

Trustee sued them alleging the Church's involvement in the fraudulent transfer.

He said people were shocked, but totally support Wahls because he acted as a good

Christian trying to serve vulnerable members of the community.

## CONCLUSIONS OF LAW

I.   **Recovering Transfers from Defendants: Fraudulent
     Conveyances and the Mere Conduit Exception**

The key issue is whether Trustee may avoid the checks provided to Wahls as

fraudulent conveyances, and if so, whether Trustee may recover the transfers from

either or both of the Defendants.  Section 548 of the Bankruptcy Code provides, in

part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or
> for the benefit of an insider under an employment contract) of an
> interest of the debtor in property, or any obligation (including any
> obligation to or for the benefit of an insider under an employment
> contract) incurred by the debtor, that was made or incurred on or
> within 2 years before the date of the filing of the petition, if the debtor
> voluntarily or involuntarily—
>
> (A) . . .
>
> (B)(i) **received less than a reasonably equivalent value in
> exchange for such transfer** or obligation; and
>
>> (ii)(I) was insolvent on the date that such transfer was made
>> or such obligation was incurred, or became insolvent as a
>> result of such transfer or obligation;
>>
>> . . . .

11 U.S.C. § 548(a)(1)(B) (emphasis added).

8

Here, the parties do not dispute that Agriprocessors wrote checks to Garnavillo Gospel or Wahls within two years of the petition. The parties also agree that Debtor was insolvent during the two years before filing its bankruptcy petition. The Court concludes, however, that the Trustee has failed—among other things—to prove Debtor received less than a reasonably equivalent value.

### A.   Cottonballs and/or Agriprocessors Received Reasonably Equivalent Value

Whether Debtor received reasonably equivalent value is a question of fact. Meeks v. Don Howard Charitable Remainder Trust (In re S. Health Care of Ark., Inc.), 309 B.R. 314, 319 (B.A.P. 8th Cir. 2004) (citing Jacoway v. Anderson (In re Ozark Rest. Equip. Co.), 850 F.2d 342, 344 (8th Cir. 1988)). Value "means property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ." 11 U.S.C. § 548(d)(2). Reasonably equivalent value, however, is not defined in the Bankruptcy Code. BFP v. Resolution Trust Corp., 511 U.S. 531, 535 (1994). Generally, courts look to whether there has been a "fair exchange" in the transaction. Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.), 267 B.R. 602, 612 (B.A.P. 8th Cir. 2001); see also BFP, 511 U.S. at 545 (noting that "outside of the foreclosure context," reasonably equivalent value is "similar to fair market value").

Trustee has the burden of proving by a preponderance of the evidence that the transfer was not for reasonably equivalent value. S. Health Care of Ark., Inc.,

9

309 B.R. at 319; <u>Richards & Conover Steel, Co.</u>, 267 B.R. at 612.  "This requires

analysis of whether: (1) value was given; (2) it was given in exchange for the

transfers; and (3) what was transferred was reasonably equivalent to what was

received."  <u>Richards</u>, 267 B.R. at 612.

> There is no bright line rule used to determine when reasonably
> equivalent value is given."  <u>See</u> In re Lindell, 334 B.R. 249, 255–56
> (Bankr. D. Minn. 2005), citing <u>In re Ozark Restaurant Equipment Co.,
> Inc.</u>, 850 F.2d 342, 345 (8th Cir. 1988) (determination of reasonably
> equivalent value is based on a "totality of the circumstances"); <u>Barber
> v. Golden Seed Co.</u>, 129 F.3d 382, 387 (7th Cir. 1997) (standard for
> reasonable equivalence should depend on all the facts of each case).
> "A determination of reasonably equivalent value is 'fundamentally
> one of common sense, measured against market reality.'"  <u>Lindell</u>,
> 334 B.R. at 256, citing <u>In re Northgate Computer Sys., Inc.</u>, 240 B.R.
> 328 (Bankr. D. Minn. 1999).   "When evaluating a transfer for
> reasonable equivalency under 11 U.S.C. § 548(a)(1)(B)(I) a court
> must examine the entire situation."  <u>Lindell</u>, 334 B.R. at 255, citing
> <u>Ozark Restaurant</u>, 850 F.2d at 344–45.

<u>Sullivan v. Schultz (In re Schultz)</u>, 368 B.R. 832, 836 (Bankr. D. Minn. 2007).

Reasonably equivalent value may be demonstrated by showing the effect that the

transfer had on the debtor.  <u>Id.</u> at 836–37 (finding that transferring funds into a

trust constituted reasonably equivalent value because it ensured that a third party

would continue to provide services to the debtor).

A debtor receives reasonably equivalent value when it receives a direct or

indirect economic benefit.  <u>Id.</u> at 836 ("When evaluating a transfer for reasonable

equivalency of value as compared to a money payment, a court must examine the

whole transaction and measure all the benefits—whether they be direct or

10

indirect." (quoting <u>S. Health Care of Ark., Inc.</u>, 309 B.R. at 319)). An economic

benefit, and therefore reasonably equivalent value, exists when a debtor pays an

antecedent debt. <u>Stalnaker v. Gratton (In re Rosen Auto Leasing, Inc.)</u>, 346 B.R.

798, 805 (B.A.P. 8th Cir. 2006); <u>Schultz</u>, 368 B.R. at 837. The debtor receives an

economic benefit even if the payment does not go directly from a debtor to the

person or entity the debtor owes. <u>See Schoenmann v. BCCI Constr. Co. (In re</u>

<u>Northpoint Commc'ns Grp.)</u>, 361 B.R. 149, 161 (Bankr. N.D. Cal. 2007); <u>Tidwell</u>

<u>v. Galbreath (In re Galbreath)</u>, 207 B.R. 309, 325 (Bankr. M.D. Ga. 1997).

For example, in <u>In re Galbreath</u>, the debtor sold his dental practice and gave

the proceeds of the sale to his wife, who deposited the $128,500.00 from the sale

into her account. 207 B.R. at 315. The debtor was not required to transfer these

funds to his wife. <u>Id.</u> at 323. The debtor's wife used $112,495.27 of the funds to

pay the debtor's obligations. <u>Id.</u> at 314. The trustee attempted to recover the

transfer from the debtor–husband to the wife as a fraudulent transfer. <u>Id.</u> at 324.

The court denied the trustee's attempt to avoid the $112,495.27, finding that "these

payments conferred a direct economic benefit upon [d]ebtor by reducing his

obligations." <u>Id.</u> at 325. Similarly, in <u>In re Northpoint Communications Group</u>, a

debtor owed money to several entities that had worked on construction projects for

the debtor. 361 B.R. at 153. A general contractor agreed to collect payment for

three subcontractors although the general contractor "was not itself obligated" to

the subcontractors.  Id.  The debtor transferred funds to the general contractor for

those subcontractors, which the bankruptcy trustee eventually sought to recover

from the general contractor as a fraudulent conveyance.  The court found that the

conveyance was not fraudulent, noting that the debtor received reasonably

equivalent value "because the payments were promptly transferred to the

[subcontractors] in satisfaction of [the debtor's] obligations to those"

subcontractors.  Id. at 161.

Here, facts presented at trial show conclusively that Debtor received

reasonably equivalent value for all the checks it wrote.  The only evidence in the

record shows Debtor (assuming for the moment Cottonballs and Agriprocessors

are really one entity[1]) received the full benefit of what it paid for: the construction

---

[1] Even if Cottonballs and Agriprocessors are separate entities, Debtor received reasonably equivalent value.
Generally, when a debtor pays the debt of a third party, there is not reasonably equivalent value to the debtor.
Richards & Conover Steel, Co., 267 B.R. at 613–14.  There is an exception to this general rule when a transfer on
behalf of a third party benefits the debtor, and when that "indirect benefit constitutes reasonably equivalent value to
the debtor, a trustee cannot avoid the transfer as fraudulent."  Id. (quoting Gill v. Brooklier (In re Burbank
Generators, Inc.), 48 B.R. 204, 206–07 (Bankr. C.D. Cal. 1985)) (internal quotation marks omitted).  For example, a
debtor that pays a bank for a shareholder's line of credit receives reasonably equivalent value when it is obligated to
pay the shareholder.  Harman v. First Am. Bank. of Md. (In re Jeffrey Bigelow Design Grp., Inc.), 956 F.2d 479,
481, 484–85 (4th Cir. 1992) (deciding that the debtor received reasonably equivalent value because it was obligated
to pay the shareholder's debts and the transfers did "not result[ ] in the depletion of the bankruptcy estate").  A
debtor that makes a payment on an obligation that it has guaranteed receives an economic benefit that is reasonably
equivalent in value.  Memory v. ALFA Mut. Fire Ins. Co. (In re Martin), 205 B.R. 646, 648 (Bankr. M.D. Ala.
1993) (denying a trustee's fraudulent transfer claim on a debtor's payment of a promissory note for which debtor
was a guarantor because the "[d]ebtor was a contingent creditor by virtue of his guaranty, who received reasonably
equivalent value in the satisfaction of an antecedent debt of the debtor"), aff'd, 184 B.R. 985 (M.D. Ala. 1995),
aff'd, 101 F.3d 708 (11th Cir. 1996) (unpublished table decision).

If the Court were to treat Cottonballs and Agriprocessors separately, it appears that the direct benefit went
to Cottonballs, but Agriprocessors also benefited from the transfers.  Agriprocessors was closely related to
Cottonballs, and having the ability to buy chickens from Cottonballs gave Debtor the assurance of a constant supply
of chickens near the Debtor's location.  Additionally, Trustee's expert Marc Ross testified that Agriprocessors
guaranteed all of Cottonballs debts, and Cottonballs usually owed money to Debtor.  If Cottonballs had not paid the
workers, Agriprocessors would have been ultimately responsible for doing so.  Debtor received an economic benefit
by directly paying the workers on a debt that Debtor would be obligated to pay as a guarantor.  Debtor received
reasonably equivalent value.

of chicken barns.  In reality, Debtor simply paid its debt for labor on the project

through each of the seventy-seven transfers at issue here.  Debtor owed the

workers for their work.  On its face, this cannot be considered a fraudulent transfer

of any sort.

Trustee appears to be attempting to avoid these undisputed facts and the

obvious legal conclusion they bring by asking the Court to simply ignore the

workers, the work they did, and the fact they got paid for that work.  Instead,

Trustee focuses solely on the fact that Ron Wahls, Present of Garnavillo Gospel,

received the funds from Debtor—and neither Wahls nor Garnavillo Gospel

provided some equivalent value to Debtor in return.  The Court declines Trustee's

invitation to ignore the reality that this transaction amounts to nothing more than

Debtor paying an antecedent debt—a debt it owed for services it indisputably

received.  Other courts dealing with even less obvious benefits to debtors have

concluded there was no fraudulent transfer.  As such, this Court finds Trustee has

failed to meet his burden of proving that these transfers were for less than a

reasonably equivalent value.[2]  The transfers were not fraudulent, and Trustee may

---

[2] Trustee asked Wahls about the number of workers that he was paying and asked about the number of barns built.  Wahls responded that the number of workers varied week to week, from two to twenty, and that Debtor had around twelve barns, but he did not know how many barns were built by those workers.  Wahls testified that the first week two men worked to unload trucks for Rubashkin, taking about five hours, and that he encouraged Rubashkin to pay them $10–$12 per hour.  Trustee did not introduce evidence about whether the wages paid to these individuals, or the other workers that Wahls paid, was a fair value for the work.  Further, Trustee did not provide information about the value of Wahls's promise to pay and performance of his promise.

not avoid them under § 548(a).[3]

### B.    Wahls Is Not an Initial Transferee

Even if the Court were to assume that somehow Debtor received no benefit

from the transfers and the transfers were constructively fraudulent, there would

still be an issue about whether Trustee could recover the transfers from

Defendants.  If there is an avoidable transfer, Trustee may recover the property

from "the initial transferee of such transfer or the entity for whose benefit such

transfer was made."  11 U.S.C. § 550(a).  Section 550 of the Bankruptcy Code

does not define the term "initial transferee," but the Eighth Circuit requires that "to

be liable under 550(a), the party must have the right to exercise **dominion and**

**control** over the funds."  Wahls, 2012 WL 1945701, at *4 (citing Luker v. Reeves

(In re Reeves), 65 F.3d 670, 676 (8th Cir. 1995)) (emphasis added).  An initial

transferee does not include a party who "acts only as a **conduit** in a transfer and

acquires no beneficial interest in the property."  Id. (quoting Bandt v. Hicks, Muse

& Co. (In re Healthco Intern., Inc.), 195 B.R. 971, 982 (Bankr. D. Mass. 1996))

(emphasis added).

The Eighth Circuit has noted that the test to determine who is an initial

transferee depends on the person's "dominion and control" over the funds

---

[3] Even if the focus was solely on Wahls and the benefit he provided to Debtor, it is not at all clear that
Trustee satisfied his burden.  The record shows Wahls provided some economic benefit to Debtor—he found a few
workers for Rubashkin, promised to pay workers with the checks that Rubashkin gave Wahls, and performed what
he promised.  Trustee did not introduce evidence explaining the value of Wahls's services or what impact there
would have been on Cottonballs or Debtor if Wahls stopped paying the workers.

transferred.  <u>Reeves</u>, 65 F.3d at 676.  Other courts have pulled these terms apart

and looked at them as two different approaches to determining who is an initial

transferee.  <u>Universal Serv. Admin. Co. v. Post-Confirmation Comm. of Unsecured</u>

<u>Creditors (In re Incomnet, Inc.)</u>, 463 F.3d 1064, 1069 (9th Cir. 2006) (recognizing

that there are two different approaches to initial transferee analysis and explaining

the differences between the two).  The first approach, known as the dominion test,

focuses on whether the party possessed the unrestricted legal authority to the use

the money or asset.  <u>Id.</u> at 1069–70; <u>see</u> <u>Abele v. Modern Fin. Plans Servs., Inc. (In</u>

<u>re Cohen)</u>, 300 F.3d 1097, 1102 (9th Cir. 2002) ("[A] transferee is one who, at a

minimum, has 'dominion over the money or other asset, the right to put the money

to one's own purposes.'" (quoting <u>Bonded Fin. Servs. v. European Am. Bank</u>, 838

F.2d 890, 893 (7th Cir. 1988)).  The second approach, known as the control test,

focuses more on the equities of the transaction as a whole "to determine, who, in

reality, controlled the funds."  <u>Id.</u> at 1070–71; <u>see</u> <u>Nordberg v. Societe Generale (In</u>

<u>re Chase & Sanborn Corp.)</u>, 848 F.2d 1196, 1199 (11th Cir. 1988) ("The control

test, then, as adopted by this circuit, simply requires courts to step back and

evaluate a transaction in its entirety to make sure that their conclusions are logical

and equitable.").

        The dominion test looks to whether "an entity had legal authority over the

money and the right to use the money however it wished."  <u>Id.</u> at 1070.  The

Seventh and Ninth Circuits utilize the dominion test, which is based on the Seventh

Circuit's decision in <u>Bonded Financial Services</u>. <u>Id.</u> at 1069–70.  In <u>Bonded</u>

<u>Financial Services</u>, a debtor wrote a check to a bank and included a note ordering

the bank to deposit the check into Michael Ryan's account.  <u>Bonded Fin. Servs.</u>,

838 F.2d at 891.  The bank deposited the money into Ryan's account, and several

days later, Ryan told the bank to debit his account and apply the money to an

outstanding loan balance that he owed to the bank.  <u>Id.</u>  The debtor filed for

bankruptcy protection shortly afterwards, and the trustee sought to recover the

transfer from the debtor to the bank.  <u>Id.</u>  The Seventh Circuit held that the trustee

could not recover from the bank because the bank was not an initial transferee

under § 550.  <u>Id.</u> at 893.  The court stated that an initial transferee needs to have

"dominion over the money or other asset, the right to put the money to one's own

purposes."  <u>Id.</u>  The bank did not have dominion when it received the check from

the debtor because the bank was a "financial intermediary" that was required to

follow the instructions that came with the check.  <u>Id.</u>  The bank did not have

dominion over the money until Ryan told it to apply the money to his loan

obligations; until that time, Ryan had dominion over the money and the ability to

do what he wanted with it.  <u>Id.</u> at 893–94.

 Rather than focusing on the legal authority to use money, the control test is

more equitable and "evaluate[s] the defendant's status in light of the entire

transaction." Chase & Sanborn Corp., 848 F.2d at 1199. The Eleventh Circuit

uses the control test in its initial transferee analysis. Id.; see also Inconmnet, 463

F.3d 1071. One example comes from a case where a debtor transferred funds to a

bank to eliminate an overdraft on an account. In re Chase & Sanborn Corp., 848

F.2d at 1198. The bankruptcy trustee sought to recover a transfer from a bank as a

fraudulent conveyance. Id. In discussing the control test, the court stated that

"[t]he control test . . . simply requires courts to step back and evaluate a transaction

in its entirety to make sure that their conclusions are logical and equitable." Id. at

1199. "The test articulated by our court is a very flexible, pragmatic one . . . ." Id.

"[T]he outcome of the cases turn on whether the [receiving parties] actually

controlled the funds or merely served as conduits, holding money that was in fact

controlled by either the transferor or the real transferee." Id. at 1200. Looking at

the entire transaction, including the timing of the transfers and the parties'

intentions, the court concluded that the bank was not an initial transferee. Id. at

1200–02.

　　　The Eighth Circuit has not as clearly articulated whether its approach leans

towards one or is in fact a combination of the two. See Luker v. Reeves (In re

Reeves), 65 F.3d 670, 676 (8th Cir. 1995) (stating only that "[a]t least seven other

circuits have held that, to be an initial transferee, a party must have dominion and

control over the transferred funds" (citing Malloy v. Citizens Bank of Sapulpa (In

re First Sec. Mortg. Co.), 33 F.3d 42, 43–44 (10th Cir. 1994); Sec. First Nat'l Bank

v. Brunson (In re Coutee), 984 F.2d 138, 140–41 (5th Cir. 1993))).

Courts within the Eighth Circuit have not strictly applied one test over the

other.  See, e.g., Miller v. T.C. Sheet Metal Control Bd. Trust Fund (In re Curran

V. Nielsen Co.), Bankr. No. 4-92-6328, Adv. No. 4-95-164, 1995 WL 711268, at

*3 (Bankr. D. Minn. 1995) (referring to both Bonded Financial Services and Chase

& Sanborn).  Some lower courts gravitate towards the dominion test.  See Sullivan

v. Gergen (In re Lacina), 415 B.R. 485, 491–92 (Bankr. D. Minn. 2011) (finding

that mother of debtor was an initial transferee when her daughter deposited a check

into her account because the mother had "legal authority to do what she liked with

the funds" (quoting Taunt v. Hurtado (In re Hurtado), 342 F.3d 528, 535 (6th Cir.

2003))).  These courts still recognize that not every transferee is an initial

transferee.  Iannacone v. IRS (In re Bauer), 318 B.R. 697, 700, 703–04 (Bankr. D.

Minn. 2005) (explaining that an initial transferee is one who has an "unfettered

legal right" to use funds, which indicates a standard closer to the dominion test, but

still finding that an entity was a conduit and not an initial transferee).

Other cases support the "logical and equitable" standard of the control test.

See Leonard v. First Commercial Mortg. Co. (In re Circuit Alliance, Inc.), 228

B.R. 225, 233 (Bankr. D. Minn. 1998) ("While not always articulated as such, the

"mere conduit" exception is supported by basic fairness as well as public policy

18

considerations: regardless of the lack of qualifying language in § 550(a), the

broadest application of the concept of "transferee" under it would inappropriately

subject mere stakeholders, bailees, and intermediaries to liability, where they had

never stood to gain personally from the funds momentarily in their possession."

(citations omitted)); see also Brown v. First Nat'l Bank of Little Rock, Ark., 748

F.2d 490, 492 n.6 (8th Cir. 1984) ("The mechanics of the transfer may not

necessarily be determinative.  The paramount consideration is whether there has

been a diminution in the bankrupt's estate as a result of the transfer."); Bergquist v.

Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft), 96 B.R. 913, 915–

16 (Bankr. D. Minn. 1989) (looking at all of the components of the transaction—

including the agreement between the parties, where the funds were deposited,

whether the funds were comingled, whether there were any restrictions on the use

of the funds, the length of time the debtor held onto the money, and how the debtor

used the money—to determine whether a debtor had an interest in property).

        This Court need not attempt to further articulate the proper test because it

finds that under either test—or both tests—Defendants are mere conduits and not

initial transferees.  Under the "dominion test," the facts in the record show

Defendants were not initial transferees.  There is no evidence Wahls ever had the

right to put the money to his own use.  He certainly never thought that he did.  He

believed he was duty bound to get the money—all of it—to the workers.  He

considered it their wages.  He testified that the checks were issued with directions

on who to pay and how much.  Wahls's understanding, quite clearly, was that he

was at most a "financial intermediary" that was required to follow the instructions

that came with the check.  Bonded Financial Servs., 838 F.2d at 893.  Trustee

presented no evidence to the contrary.  Trustee simply suggests that because the

checks were made out to Wahls or the Church Wahls served, Wahls and that

Church could have used the money how they pleased.  This suggestion has no

support in the record, which seems to clearly contradict it.  Wahls and Garnavillo

Gospel believed Wahls had the absolute duty to pay that money to the workers—

and that if he kept it he would essentially be stealing it.  The facts show Rubashkin

directed the transaction and Wahls did not have the unrestricted right to do what he

wanted with the money.  See Bauer, 318 B.R. at 703–04 (applying what appeared

to be a dominion test and finding that an insurance company was not an initial

transferee because the debtor "directed the transfer . . . merely through" the

insurance company and the debtor retained "ultimate authority over the funds").

Under the control test, Defendants are even more clearly not initial

transferees.  Wahls accepted checks from Rubashkin, cashed them, and distributed

the money to individual workers.  He was not accepting the checks for his own

benefit, no funds ever entered his bank account, and he did not keep any of the

money for himself.  Rather, he gave the money to individuals who had earned it by

20

working for Debtor.  The money was never really his to keep; he was acting as an

intermediary between Rubashkin and the workers.  Although Wahls held on to the

money for a short period of time, Rubashkin actually controlled where the funds

went.  Looking at the transaction as a whole, it is logical and equitable to find that

Wahls was not an initial transferee, but a mere conduit.

## 1. Good Faith

In his post-trial brief, Trustee argued—for the first time—that Wahls

can only be considered a mere conduit if he acted in good faith.  Trustee

asserts that Wahls did not act in good faith.  The Eighth Circuit has not

discussed whether good faith is necessary to avoid initial transferee status.

See Reeves, 65 F.3d at 676 (accepting the idea that a transferee needs to

have either dominion or control, but not discussing good faith).  District and

bankruptcy courts citing Reeves do not focus on good faith.  See, e.g.,

Ramsay v. Sunmark Contract Staffing, Inc. (In re Oldner), 224 B.R. 698

(Bankr. E.D. Ark. 1998).

Assuming good faith is an element of the mere conduit exception, the next

question would be whether Wahls acted in good faith.  While the Eighth Circuit

has not discussed good faith in the context of determining transferee status, it has

discussed good faith in similar situations.  See Brown v. Third Nat'l Bank (In re

Sherman), 67 F.3d 1348, 1355 (8th. Cir. 1995) (discussing good faith as it applies

to § 548 and citing cases applying good faith to § 550(b) and § 549(c)).  The

Eighth Circuit has said: "The Bankruptcy Code does not define good faith.  Good

faith is not susceptible of precise definition and is determined on a case-by-case

basis."  Id. (citing In re Roco Corp., 701 F.2d 978, 984 (1st Cir. 1983)).  "[A]

transferee does not act in good faith when he has sufficient knowledge to place him

on inquiry notice of the debtor's possible insolvency."  Id. (citing In re Anchorage

Marina, Inc., 93 B.R. 686, 693 (Bankr. D.N.D. 1988)); see also Meeks v. Red

River Entm't of Shreveport (In re Armstrong), 285 F.3d 1092, 1098 (concluding

that a party did not act in good faith because it should have known that the debtor

was insolvent).  The only cases discussing "good faith" in the initial transferee

context have used a similar test.  See, e.g., Huffman v. Commerce Sec. Corp. (In re

Harbour), 845 F.2d 1254, 1258 (4th Cir. 1988) (finding a lack of good faith when a

transferee "aggressively ignored facts which would have put her on notice");

Wirum v. Owen Bird Law Corp. (In re Plusfive Holdings, L.P.), Bankr. No. 06-

10307, Adv. No. 07-1076, 2008 WL 5749937, at *2 (Bankr. N.D. Cal. 2008)

(stating that "[a] person loses the claim to mere conduit status by ignoring facts

which puts him on notice").

Based on the facts of this case and the testimony at trial, the Court finds that

Wahls acted in good faith.  He did not receive any direct or indirect benefit from

the transfers, nor did anyone that he was close to.  He did not keep any of the

22

money, Agriprocessors did not pay him, and the individuals who were ultimately

paid for their work were not relatives or church members.  Wahls was not

distributing the money because he wanted to help Debtor or gain a benefit for

himself, his family members, or his associates.  He genuinely believed that he was

helping these workers and paying them what they deserved.  Although it was an

unconventional way of paying workers, Wahls did not "turn a blind eye" to the

facts.  He was not willfully ignoring actions that could have indicated that the

transfers were fraudulent; he was simply doing what he thought was right.  Unlike

the individuals in <u>Armstrong</u> who should have known that the debtor was

insolvent, Wahls was not aware of facts that would have notified him of Debtor's

insolvency.  There was no "fraud" here the way Trustee argues it.  There was no

reason for Wahls to suspect that Debtor was fraudulently paying the individuals—

he knew they worked and earned their money.  Wahls's only possible inquiry

might have been whether the transaction was all being done the right way, but

there is no indication that he should have known it could be fraud.  In fact, Trustee

does not even argue—and certainly presented no evidence—that the payments to

the workers were fraudulent in any way.  Again, Trustee simply asks the Court to

ignore the reality of the transaction—a payment to workers for work done—and

instead treat this arrangement as a transaction only involving Agriprocessors and

Wahls.  If good faith is a requirement of the mere conduit exception, Wahls has

23

more than met that standard.  He is not an initial transferee from whom the

Transferee could recover; he was a mere conduit who was acting in good faith.

## II.  Standing to Recover Checks Written by Cottonballs

Even if the Court is incorrect in finding the Trustee cannot recover at all, the

Court additionally and alternatively finds that any potential recovery would be

significantly limited and reduced for additional reasons.

Trustee is seeking to avoid checks to Garnavillo Gospel and Ron Wahls

written by either Agriprocessors or Cottonballs.  At trial, the parties stipulated that

Wahls accepted sixty-nine checks totaling $141,700.25.  The checks written from

Agriprocessors total $14,420.30, and the checks written on Cottonballs' account

total $127,279.92.  During the trial, Trustee argued that Agriprocessors controlled

Cottonballs and that Cottonballs was essentially an asset of Agriprocessors.  In a

previous adversary, however, Trustee argued that Cottonballs was a creditor of

Agriprocessors.  Saracheck v. Cottonballs, LLC (In re Agriprocessors, Inc.),

Bankr. No. 08-2751, Adv. No. 10-09124, 2012 WL 2411869 (Bankr. N.D. Iowa

June 26, 2012).  In that adversary, Trustee sought to avoid $3,570,584.40 as a

fraudulent conveyance or preferential transfer.  Id. at *1, *4.  Trustee's expert,

Marc Ross, stated that there was no consideration or new value exchanged for the

payments.  Id. at *4.  The Court granted judgment in favor of Debtor, concluding

that the $3,570,584.40 constituted a fraudulent transfer.  Id.

First and foremost, Trustee is judicially estopped from making the argument it attempts here—that Cottonballs and Agriprocessors are basically the same entity. Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Knigge v. SunTrust Morg., Inc. (In re Knigge), 479 B.R. 500, 507 (B.A.P. 8th Cir. 2012) (quoting Equal Emp't Opportunity Comm'n v. CRST Van Expedited, Inc., 679 F.3d 657, 679 (8th Cir. 2012)) (internal quotation marks omitted). Trustee here is trying to take these opposing positions and the Court will not allow it.

Moreover, Trustee can only avoid transfers of the debtor's property. See 11 U.S.C. § 548(a)(1) (stating that a trustee "may avoid any transfer . . . of an interest of the debtor in property"). Trustee lacks standing to avoid transfers from separate entities. See Firstar Bank Milwaukee v. Morken (In re Spring Grove Livestock Exch.), 205 B.R. 149, 156 (Bankr. D. Minn. 1997) ("[Trustee] seeks relief to which he is not entitled. As trustee for the [debtor], [trustee] lacks standing to recover transfers from [debtor's corporation]."); see also Miller v. Barenberg (In re Bernard Techs., Inc.), 398 B.R. 526, 529 (Bankr. D. Del. 2008) (stating that a trustee could not avoid transfers made from a "separate and distinct" non-debtor subsidiary because "the transferred assets were not property of the [d]ebtor"). Trustee has already treated Cottonballs as a separate entity, and the Court has

25

accepted this characterization.  Since Cottonballs is a separate entity, Trustee does not have the power to recover the transfers made from Cottonballs.  Therefore, the only money left at issue is the $14,430.25 that Agriprocessors itself transferred to Garnavillo Gospel and/or to Ron Wahls, individually.

### III. Recovering from Garnavillo Gospel

Even if trustee could make some recovery in this case, the issue remains as to whether Garnavillo Gospel is liable for the transfers, enabling Trustee to seek recovery against it.  Trustee argues that Wahls was acting as Garnavillo Gospel's agent, so his actions bound Garnavillo Gospel and made it liable for the transfers.  Courts determine whether an agency relationship exists by looking to state law.  Wahls, 2012 WL 1945701, at *5.  An agency relationship "results from (1) manifestation of consent by one person, the principal, that another, the agent, shall act on the former's behalf and subject to the former's control and, (2) consent by the latter to so act."  Soults Farms, Inc. v. Schafer, 797 N.W.2d 92, 100 (Iowa 2011) (quoting Pillsbury Co. v. Ward, 250 N.W.2d 35, 38 (Iowa 1977)) (internal quotation marks omitted).  An agent may have actual authority to act on the principal's behalf, which may be either express authority or implied authority.  Agristar Leasing v. Farrow, 826 F.2d 732, 737 (8th Cir. 1987).  An agent may also have apparent authority based on authority that "although not actually granted, has been knowingly permitted by the principal or which the principal holds the agent

26

out as possessing." Magnusson Agency v. Pub. Entity Nat'l Co. Midwest, 560

N.W.2d 20, 25–26 (Iowa 1997).

"A fundamental principle of agency law is that whatever an agent does,

within the scope of his or her actual authority, binds the principal." Id. at 25.

However, there is a limit to what actions can bind the principal. Soults, 797

N.W.2d at 100–01 ("Logically, the scope of an agency relationship must have

boundaries as a principal cannot be held liable for all actions an agent takes while

going about his daily life. . . . Stated another way, when the agent is not transacting

on behalf of the principal, the principal is not liable for the agent's transactions.").

Wahls is the President of Garnavillo Gospel. While Garnavillo Gospel's

treasurer handled most financial matters, as President, Wahls had the power to

write and deposit checks for Garnavillo Gospel's benefit. Although he may have

had authority to cash checks written to Garnavillo Gospel, he was not acting on the

church's behalf when he cashed the checks from Debtor. Wahls did not ask

Rubashkin to write the checks to Garnavillo Gospel, and no one else at Garnavillo

had any knowledge of the checks. Wahls cashed the checks at his personal bank,

not at Garnavillo Gospel's bank, and the money never entered Garnavillo Gospel's

account. Neither Garnavillo Gospel nor Wahls kept any of the cash for their own

benefit. Rather, per Rubashkin's instructions, Wahls distributed the money to

individuals who performed work for Debtor. These workers were not members of

27

Garnavillo Gospel.  The only connection that Garnavillo Gospel has to the

transfers is being listed as payee on a majority of the checks.  This is not enough to

find that Wahls was acting as an agent for Garnavillo Gospel.  Wahls was acting in

his individual capacity, and was "not transacting on behalf of the principal."  <u>See</u>

<u>id.</u> at 100.  Since Wahls was not acting on Garnavillo Gospel's behalf, he did not

bind Garnavillo Gospel, and Garnavillo Gospel is not liable for any potentially

fraudulent transfers.

## CONCLUSION

For all these reasons, the Court finds Trustee has failed to prove his claim

against Defendants.  **WHEREFORE**, judgment is entered in Defendants' favor.

Dated and Entered:  March 28, 2013

_____

**THAD J. COLLINS, CHIEF JUDGE**
**UNITED STATES BANKRUPTCY COURT**